## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-cv-08454 |
| : | |
| TODAY'S GROWTH CONSULTANT, INC. : | |
| (dba THE INCOME STORE) : | |
| : | |
| and : | |
| : | |
| KENNETH D. COURTRIGHT, III, : | |
| : | |
| Defendants. : | |
| : | |

| | |
|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF | ANCILLARY CASE NO. |
| TODAY'S GROWTH CONSULTANT, INC. | |
| (dba THE INCOME STORE), | |
| | |
| Plaintiff, | |
| v. | |
| | |
| SMITHAMUNDSEN, LLC, | |
| | |
| Defendant. | |
| _____/ | |

## **COMPLAINT**

Plaintiff, Melanie E. Damian, in her capacity as the Court-Appointed Receiver ("Plaintiff" or the "Receiver") for Today's Growth Consultant, Inc. (dba "The Income Store"), in the action titled *Securities and Exchange Commission v. Today's Growth Consultant Inc., et al.*, Case No. 1:19-cv-08454 (N.D. Ill. Dec. 27, 2019), hereby sues Defendant, SmithAmundsen, LLC ("Defendant") asserting claims for legal malpractice and aiding and abetting breach of fiduciary duty, and states:

## BACKGROUND

1.      This action arises from the investigation of Plaintiff, Melanie E. Damian, as Receiver appointed by the U.S. District Court for the Northern District of Illinois in the enforcement action of *Securities and Exchange Commission v. Today's Growth Consultant, Inc. (d/b/a "The Income Store") and Kenneth D. Courtright, III*, Civil Action No. 1:19-cv-08454 (the "SEC Action"), to halt the long-running Ponzi scheme perpetrated by Today's Growth Consultant, Inc. ("TGC") and its founder, Kenneth D. Courtright ("Courtright"), which defrauded more than 750 investors out of approximately $75 million.

2.      The Ponzi scheme was accomplished through TGC and Courtright's luring of investors to execute "Consulting Performance Agreements" wherein TGC promised to provide its investors with a minimum guaranteed rate of return, in perpetuity, on alleged "revenues" generated by websites that TGC acquired or built for each investor, and that TGC then developed, maintained, and hosted.  Relatively early on in the scheme, TGC was unable to keep up with the investor payouts such that, in classic Ponzi-like fashion, TGC began paying the existing investors with new investor funds, rather than from the website revenue.

3.      On December 30, 2019, the Illinois District Court for the Northern District of Illinois (the "Illinois District Court") entered a Temporary Restraining Order Freezing Assets and Imposing Other Emergency Relief [ECF No. 20] ("TRO") and an Order Appointing Receiver [ECF No. 19] ("Appointment Order") in the SEC Action.  As part of the Receiver's investigation, the Receiver analyzed TGC's business operations, including projected and historic income and expenses, and confirmed the SEC's allegations that new investor funds and loans, and not website revenue, were used to pay the investors/website partners.

4. On March 2, 2020, the Illinois District Court entered two separate stipulated preliminary injunction orders titled Order Imposing Preliminary Injunction Freezing Assets and Granting Other Relief [ECF Nos. 55, 56] against TGC and Courtright, which shall remain in effect until further order of the Court.

5. The Receiver has standing to bring the claims asserted in this Complaint pursuant to the Illinois District Court's TRO, Appointment Order, and PI Orders. Relevant here, the Appointment Order directed the Receiver to "assume and control the operation of [TGC] and . . . pursue and preserve all claims or interests" of TGC. *See* ECF No. 19, at p. 3. Included among such claims are legal malpractice actions to recover, for the benefit of the Estate, the damages suffered by TGC and its investors due to the negligence of its legal counsel, Defendant SmithAmundsen, and said counsel's assisting Courtright to breach his fiduciary duties to TGC.

## PARTIES, JURISDICTION AND VENUE

6. Plaintiff, Melanie E. Damian, was appointed in this District as Receiver of TGC. Plaintiff brings this action in her capacity as Receiver, pursuant to the authority granted by this Court in the SEC Action.

7. Defendant, SmithAmundsen, LLC ("SmithAmundsen"), was and is a law firm with offices in eight locations across the Midwest, with its principal place of business in Chicago, Illinois.

8. This Complaint is brought to accomplish the ends sought and directed by the Illinois District Court in the SEC Action, which, among other things, appointed Plaintiff as Receiver and authorized her to commence actions to recover assets and pursue claims of the Receivership Estate. This action is related to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, in that this

action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction, this Court has supplemental jurisdiction over the claims set forth herein pursuant to Title 28, United States Code, Section 1367(a). Therefore, this Court has subject matter jurisdiction over this action.

9.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Chicago, Illinois. Moreover, Defendant provided legal services to TGC, which was conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Northern District of Illinois.

10.     Venue is proper in the Northern District of Illinois, pursuant to Title 28, United States Code, Sections 754, 1391(b), and 1692, because this action is brought to accomplish the objectives of the TRO, the Appointment Order, and the PI Orders entered in the SEC Action, and is thus ancillary to the Illinois District Court's exclusive jurisdiction over the Receivership Estate. Moreover, certain acts described in this Complaint occurred in the Northern District of Illinois, and, upon information and belief, victims of TGC's scheme were located in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

11.     TGC was founded in 2009 by Courtright. Its business model consisted of TGC entering into Consulting Performing Agreements with investors (each, an "Agreement" and collectively, the "Agreements"), wherein the investors agreed to provide up-front and ongoing payments for TGC to acquire or build "revenue generating websites" that TGC would then develop, maintain and host. In the Agreements, TGC promised each investor the larger of either 50% of the assigned website revenues or a minimum annual guaranteed return (typically ranging

from 13%-20% of the initial investment amount) to be paid monthly, *even if the investor's website revenue was insufficient to pay that return*.

12.     The revenue that was generated from the websites each month was significantly less than the monthly payment obligations to the investors and certainly was not sufficient to cover both those monthly payments and TGC's monthly overhead expenses.

13.     As a result, TGC began operating a Ponzi scheme.  It covered the significant shortfall in website revenue primarily by using the up-front fees it obtained from new and repeat investors who had entered into Agreements with TGC, and also by using the commingled proceeds of significant loans it received from lenders, to pay the minimum monthly payments it guaranteed to earlier investors under the Agreements, and to make payments towards the loans.

14.     Throughout most of TGC's existence, TGC's general counsel for nearly all its business matters was attorney Michael J. Polachek ("Polachek").  In early 2016, Polachek began to suspect that the Agreements could be considered "investment contracts" and thus constituted securities for which registration was required.

15.     Around that same time, precisely when Polachek began to raise these securities concerns, Courtright received a subpoena from the SEC on May 31, 2016 (the "SEC Subpoena").

16.     The SEC Subpoena was issued to Courtright as part of the SEC's investigation in *In the Matter of Smart Money Financial Group, Inc*. (D-3617).

17.     The SEC had linked Smart Money Financial Group ("Smart Money") to TGC and Courtright because Smart Money had been one of TGC's principal investors.  Additionally, Smart Money's founder, Ron Fossum ("Fossum"), had been Courtright's business partner, and Fossum (through Smart Money) had entered into numerous Agreements with TGC.

18.    Notably, the purpose of the SEC's investigation into Smart Money was to determine whether Smart Money was operating as a Ponzi scheme.

19.    In the SEC Subpoena, the SEC requested that TGC produce documents and information regarding, among other things, TGC's business model, the Agreements that TGC had entered into with Smart Money, and Courtright's relationship with Fossum. This presented an issue for TGC because, if indeed the interest conveyed under the Agreements was a "security" and it did not fall under any of the exceptions (as suspected by Polachek), TGC was required by law to file a registration statement with the SEC.

20.    Facing an SEC Subpoena that requested significant information about TGC's business model, and knowing that the TGC Agreements were possibly violating the SEC registration requirements, Polachek recommended to TGC that it retain Defendant SmithAmundsen as TGC's primary securities counsel because Defendant had (and has) attorneys that practice in the area of securities laws.

21.    TGC thus entered into an attorney-client relationship with Defendant SmithAmundsen on or about June 15, 2016. The Engagement Letter (the "SA Engagement Letter") provided the scope of SmithAmundsen's representation of TGC:

> 1) To analyze whether a certain instrument [*i.e.* the Agreement], which [Ken Courtright] will send to us, constitutes a "security" for state or federal regulatory purposes, or otherwise requires Today's Growth or its employees to be licensed, and 2) counsel Today's Growth in connection with complying with an SEC subpoena to it in *In the Matter of SMFG, Inc.*, (D-3617).

*A true and correct copy of the SA Engagement Letter is attached hereto as* **Exhibit "A"**.

22.    In connection with its representation of TGC, Defendant collected and reviewed information relating to TGC's business model, including TGC's calculation of revenue, and TGC's Agreements and business dealings with Smart Money/Fossum. Defendant also worked

with Courtright to prepare him for, and to represent Courtright at, Courtright's deposition with the SEC in furtherance of the Smart Money investigation.

23. At the outset of Defendant's representation of TGC, Defendant was clearly aware that the SEC's subpoena to TGC indicated a strong likelihood that the SEC would directly investigate TGC's business and that TGC may also be operating as an illegal Ponzi scheme. As stated by SmithAmundsen attorney John Collen in an internal email on June 16, 2016:

> I have advised Ken [Courtright] very clearly that *the SEC investigation [of Smart Money] could easily expand to include/target Today's Growth* because SEC subpoenas are directed to people whom the SEC thinks have knowledge of, or connections to, whatever it is investigating. As I put it, "They didn't subpoena you because they thought you were like an innocent bystander witnessing a traffic accident."

*A true and correct copy of the June 16, 2016 correspondence is attached hereto as* **Exhibit "B"** (emphasis added). Notably, and also in the June 16, 2016 correspondence, **Mr. Collen noted that the SEC investigation was "apparently concerned on whether [Smart Money] is a Ponzi Scheme" and that Smart Money was "in the same basic business as TGC"**. *Id.*

24. In July of 2016, Mr. Collen further noted that the response to the SEC Subpoena had been prioritized over the analysis of the Agreements:

> Can we please give Mike [Polachek] a preliminary assessment ASAP, as well as indicate what additional work needs to be done? Eric, I know you needed to circle back to Vic on some point. I'd be most appreciative if that can be done promptly so Vic can talk to Mike [Polachek], ideally tomorrow. . . . just to get something moving if he's not satisfied with the pace. *My sense here is that we have dived into the SEC subpoena issue with alacrity, but perhaps have been less attentive on the other issue of whether the Agreement is a security.*

*A true and correct copy of the July 7, 2016 correspondence is attached hereto as* **Exhibit "C"** (emphasis added).

25. Ultimately, on July 13, 2016, SmithAmundsen produced a memorandum (the "Memorandum") to TGC regarding "Whether Consulting Performance Agreement Interests

Constitute Securities". *A true and correct copy of the Memorandum is attached hereto as* **Exhibit "D"**. The Memorandum principally analyzed TGC's business model as reported to Defendant by Courtright and Polachek, and also analyzed three TGC Agreements, one of which was between TGC and Smart Money.

26.    Defendant's Memorandum concluded that interest transferred under the Agreements would likely be considered securities, but that Defendant needed more information before it could make a definitive conclusion:

> *This memo's answer on the key issue of whether the interest conveyed under a Consulting Performance Contract constitutes a security is inconclusive, partly because additional information is needed and partly as a result of the split between relevant authorities on whether vertical commonality suffices, or horizontal commonality is necessary, to satisfy the common enterprise element of the Howey test.* However, subject to additional information that may subsequently be received, and making the (reasonable) assumption that those who contributed money to SMSIF were investing in an Authority Site managed by Today's Growth, it is possible to *provisionally* conclude that the S.E.C. and probably even the Seventh Circuit would take the position that the Consulting Performance Agreements – at least the one with SMSIF – are investment contracts.

*See* **Exhibit "D"** at p. 7 (emphasis added).

27.    Thus, by July of 2016, it is undisputed that Defendant had direct knowledge of the following: (1) that TGC had been operating for several years without securities counsel; (2) that the Agreements had never been registered as securities; (3) that the SEC had in its possession several TGC Agreements; (4) that the Agreements were likely unregistered securities and as such, TGC was actively violating securities laws; (5) that the SEC was investigating one of TGC's principal investors, Smart Money, for running a Ponzi scheme; (5) that Smart Money was "in the same basic business" as TGC; and (6) that there was most certainly an impending SEC investigation of TGC.

28.     But, even with all this information, Defendant did not take any steps to independently investigate TGC's business and did not act with urgency in identifying and correcting the securities issues with the Agreements or even recommending that such action be taken.

29.     Defendant's lack of investigation of TGC's business is further evidenced by the fact that the Memorandum contained incorrect statements regarding TGC's business model. For example, the Memorandum alleges that TGC "transfers ownership of the Authority Site to the [investor]."   In reality, however, the websites and domains (with minor exceptions) were maintained in the name of, and owned by, TGC and not the individual investors.   Another Example is the Memorandum's statement that each investor "receives profits only from the Authority Site that it owns." Again, the investor did not own the site. And, TGC's promise to its investors of "guaranteed returns" (*i.e.* the investor would receive returns even if even if the investor's website revenue was insufficient to pay that return) belied Defendant's statement that the investor's "profits" were derived solely from the Authority Site owned by the investor.

30.     Following the Memorandum, and in order to assist Defendant with obtaining the additional information it requested in the Memorandum, Courtright immediately provided Defendant with another twenty Agreements for its review.

31.     Over the next several *months* and well into 2017, Defendant and Courtright exchanged email correspondence regarding potential revisions to the Agreements, but Defendant never produced a final revision or made any final recommendation to TGC regarding how it could become in compliance with the law or that it needed to register the Agreements with the SEC.

32.     Three years later, on July 5, 2019, Polachek again raised his concerns to Courtright that the Agreements could convey the sale of a security and recommended that Defendant rereview the Agreements:

> For *several years* now I have been concerned that the Consulting Agreement could be interpreted to be the sale of a security. . . . In addition, *I have a concern about the possible inflation of TGC revenues resulting in potentially deceptive claims by TGC about its business performance* – which could impact website purchasers, lenders, future investors and potential buyers of the TGC business someday.

*A true and correct copy of the July 5, 2019 email is attached hereto as* **Exhibit "E"** (emphasis added).

33.     Heeding Polachek's advice, TGC requested that Defendant again analyze the Agreements.  A review of SmithAmundsen's billing records from this time-period shows that Defendant charged TGC over $6,000 to research the same case law and perform the very same analysis that it had three years prior.

34.     This time, however, Defendant concluded that the Agreements were investment contracts and thus were securities. As documented in a July 15, 2019 email correspondence from Polachek to Courtright:

> I just met with Eric Fogel [from SmithAmundsen] on the Consulting Agreement. He confirms that it is an investment contract and as such is subject to the securities laws.  He cited to the long-standing US Supreme Court case *SEC v. Howey* that defines an investment contract as "a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." . . . Also, we are concerned about what you are saying in your radio advertising.  These may be considered a general solicitation which is prohibited under securities laws unless the security is registered – a very expensive and time-consuming process.

*A true and correct copy of the July 15, 2019 email is attached hereto as* **Exhibit "F"**.

35.     Defendant's conclusion, however, came much too late.  Just a few months later, on December 27, 2019, the SEC Action was filed against TGC, and the Receiver was appointed.

36.     The *crux* of the SEC's Complaint was that TGC was running an illegal Ponzi scheme, and that TGC misled and defrauded potential and existing investors across the United States and the world through the offer and sale of *unregistered securities* (*i.e.* through the offer and sale of the Agreements).

37.     As such, TGC was sued by the SEC for the securities violations that Defendant should have investigated, identified and corrected three years earlier as TGC's primary securities counsel.   At the very least, Defendant was obligated to advise how TGC could come into compliance or that it needed to discontinue its operations.

38.     As a result of operating an unregistered business that was a Ponzi scheme, TGC was insolvent, undercapitalized, and operating at a loss.   Defendants' actions and inactions resulted in, or significantly contributed to, TGC continuing its fraudulent operations for an additional three years.   Had Defendant investigated TGC and timely counseled TGC to register the securities or otherwise come into compliance with the law, it is highly probable that TGC's Ponzi scheme would have been halted by the SEC in 2016 – instead of three years later in 2019.

39.     Because most TGC investors have not received the return of their investment or all of the amounts due to them under the Agreements, these investors will have significant claims against the Receivership Estate to recover their investments.

40.     As a result of Defendant's negligence, TGC has suffered millions of dollars in damages.

41.     All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

**CLAIMS FOR RELIEF**

**COUNT I**
**Legal Malpractice**

42.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43.     An attorney-client relationship existed between Defendant SmithAmundsen and TGC.

44.     Pursuant to the attorney-client relationship between Defendant and TGC, Defendant owed TGC the duty to exercise ordinary care, skill and knowledge which members of the legal profession ordinarily possess.

45.     Defendant's duty to exercise ordinary care, skill and knowledge included the duty to make a reasonable effort to independently verify the facts on which Defendant's legal advice was based, the duty to give advice when necessary to prevent or rectify unlawful or improper acts of TGC, the duty to investigate any "red flags" that arose during the course of Defendant's representation of TGC, and to counsel against and/or prevent the violations of law, civil and criminal.

46.     For the reasons more fully set forth above, Defendant SmithAmundsen breached its duty to exercise ordinary care, skill and knowledge during the rendering of legal representation to TGC by, *inter alia*:

    a.  Failing to investigate TGC's financial representations in connection with the method and manner in which TGC calculated revenue and provided the guaranteed investor payouts under the Agreements.

    b.  Failing to investigate TGC's representations with respect to the ownership of the websites which TGC's investors believed they were purchasing to own;

    c.   Failing to advise TGC of the impropriety of TGC's business operations;

    d.   Failing to advise TGC that its failure to register the Agreements was unlawful;

    e.   Failing to advise TGC as to how to correct its violations and/or to cease operations.

47.    Defendant SmithAmundsen's breaches of its duty to exercise ordinary care, skill and knowledge during the course of its representation to TGC, *inter alia*, deepened TGC's insolvency, causing irreparable damage to TGC and TGC's creditors.

WHEREFORE, Plaintiff hereby demands judgment against Defendant, SmithAmundsen, LLC, for the total amount of damages resulting from the Defendant SmithAmundsen's legal malpractice committed while acting as TGC's primary securities counsel, plus costs and interest, and any such further relief that this Court deems to be appropriate and just.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty

51.    The Receiver hereby reasserts and realleges the allegations set forth in paragraphs 1 through 41 as if fully set forth herein.

52.    As set forth above, during the time that Defendant was representing TGC as its primary securities counsel, TGC was actively violating securities laws, and operating as a fraudulent scheme and Ponzi scheme to the detriment of TGC and its investors and/or creditors, as determined by the Court in the TRO and PI Orders.

53.    By violating the securities laws, defrauding TGC's investors and operating a Ponzi scheme, Courtright breached his fiduciary duty to TGC's investors to safeguard their investments and not use their investment funds for his own personal benefit.

54.    Defendant's role as primary securities counsel for TGC included Defendant's review of TGC's business model and business documents, revenue calculations, and several

TGC Agreements with varied investors. Additionally, Defendant represented TGC in an SEC investigation of Smart Money, one of TGC's principal investors and business partners that was suspected by the SEC of running a Ponzi scheme in a business that Defendant recognized was "essentially the same" as TGC.

55.     For at least three years, from mid-2016 through mid-2019, Defendant knew that TGC was actively violating the U.S. securities laws in operating under and entering into new Agreements with investors that constituted unregistered securities. Defendant also knew, based on the SEC's allegations against Smart Money and the guaranteed investor payouts that TGC promised under the Agreements, that TGC was likely falsely inflating its revenues and operating as a Ponzi scheme.

56.     Nevertheless, Defendant knowingly and substantially assisted Courtright in breaching his fiduciary duty to investors by, inter alia:

a.  failing to investigate TGC's representations regarding its revenue and overall business model;

b.  failing to register the Agreements with the SEC and/or to revise the Agreements and TGC's business model such that the interest transferred under the Agreements did not constitute a security or otherwise complied with the law; and/or

c.  failing to advise TGC that if it did not come into compliance with the law, that TGC had to cease operations.

57.     As a direct and proximate result of Defendant's conduct, TGC sustained damages.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

14

WHEREFORE, Plaintiff, as the Receiver for TGC, respectfully requests that the Court enter judgment against Defendant for compensatory damages and/or restitution, interest, costs, and for such further relief as may be just and proper.

Dated: May 27, 2022

Respectfully submitted,

/s/*Kenneth Dante Murena*
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
Christine M. Dimitriou
Florida Bar No. 99381
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
Email: cdimitriou@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

*General Admission to N.D. Ill.*