IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF TODAY'S GROWTH CONSULTANT, INC. (dba THE INCOME STORE), | ) ) ) ) ) | |
| Plaintiff, | ) | No. 22 C 2830 |
| v. | ) ) | Judge Virginia Kendall |
| SMITHAMUNDSEN, LLC, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Melanie Damian, as receiver of Today's Growth Consultant Inc. ("TGC"), sued SmithAmundsen, LLC ("SA") for legal malpractice and aiding and abetting breach of fiduciary duty. (Dkt. 27). SA had given legal advice to TGC prior to the SEC bringing a suit against it for operating a Ponzi scheme. The crux of TGC's First Amended Complaint is that it would not have been charged but for the poor advice given to it by SA. SA moves to dismiss the complaint for failure to state a claim. (Dkt. 39). For the following reasons, the motion is granted. (*Id.*)

## BACKGROUND

TGC was allegedly involved in a "Ponzi scheme perpetrated by TGC and its founder, Kenneth D. Courtright." (Dkt. 27 ¶¶ 4, 15). As part of the scheme, TGC entered into "Consulting Performance Agreements" ("CPAs") with investors, whereby investors agreed to provide upfront and ongoing payments in exchange for "revenue generating websites" that TGC developed, maintained, and hosted. (*Id.* ¶¶ 5, 15). TGC, however, was unable to keep up with the necessary investor payments, so the company resorted to paying existing investors with new investor funds, not from website revenue. (*Id.* ¶ 5).

1

On May 31, 2015, the Securities and Exchange Commission ("SEC") issued a subpoena to TGC as part of an investigation into Smart Money Financial Group, Inc. ("Smart Money"). (*Id.* ¶ 19). The agency requested that TGC produce documents and information related to the CPAs. (*Id.* ¶ 22). This production posed a problem for TGC because if a CPA was a "security," then TGC was required by law to file a registration statement with the SEC. (*Id.*) TGC's general counsel, Michael J. Polachek, decided to retain SA as TGC's primary securities counsel. (*Id.* ¶ 23). On June 15, 2016, the two parties agreed to the Engagement Letter, which set out the scope of SA's representation:

> 1) To analyze whether a certain instrument [*i.e.* the Agreement], which [Ken Courtright] will send to us, constitutes a "security" for state or federal regulatory purposes, or otherwise requires Today's Growth or its employees to be licensed, and 2) counsel Today's Growth in connection with complying with an SEC subpoena to it in In the Matter of SMFG, Inc., (D-3617).

(*Id.* ¶ 25).

SA collected information to answer the two questions outlined. (*Id.* ¶ 28). Early on, one SA attorney noted that the SEC investigation might broaden to include TGC. (*Id.*) John Collen wrote in an email, "I have advised Ken [Courtright] that the SEC investigation could easily expand to include/target Today's Growth" because Smart Money "is a Ponzi Scheme," and Smart Money was "in the same basic business as TGC." (*Id.*) In the end, SA produced a memo concluding that "the key issue of whether the interest conveyed under a [CPA] constitutes a security is inconclusive." (*Id.* ¶ 30). "[I]t is possible to provisionally conclude that the S.E.C. and probably even the Seventh Circuit would take the position that the [CPAs]—at least the one with SMSIF— are investment contracts," and thus securities. (*Id.* ¶ 31).

TGC gave SA more agreements to analyze. (*Id.* ¶ 35). SA and Courtright exchanged emails for several months about how to ensure compliance with securities law. (*Id.* ¶36). SA even

allegedly assisted TGC's purchase of 151 websites owned by Smart Money. (*Id.* ¶ 37). Polachek was still concerned though that the CPAs were securities and recommended SA re-review the agreements. (*Id.* ¶ 38). TGC then asked SA again to analyze the agreements, and SA concluded once more the investment contracts were investment contracts (that is, securities). (*Id.* ¶ 39).

The warning came too late for TGC. The SEC brought an action against the company. (*Id.* ¶ 6). A court in this district entered a Temporary Restraining Order Freezing Assets and an Order Appointing Receiver. (*Id.*) Melanie E. Damian was appointed as receiver. (*Id.*) She filed a complaint against SA for legal malpractice and aiding and abetting breach of fiduciary duty. (*Id.* ¶¶ 48-60). SA now moves to dismiss the complaint for failure to state a claim. (Dkt. 39).

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678).

3

## ANALYSIS

### I.    Legal Malpractice

"To succeed in an action for legal malpractice, a plaintiff must plead and prove '(1) the existence of an attorney/client relationship; (2) a duty arising from that relationship; (3) a breach of that duty on the part of defendant/counsel; (4) proximate cause; and (5) damages.'" *Rojo v. Tunick*, 193 N.E.3d 149, 156 (Ill. App. Ct. 2021) (quoting *Paulsen v. Cochran*, 826 N.E.2d 526, 529 (Ill. App. Ct. 2005)); *see also Rocha v. Rudd*, 826 F.3d 905, 909 (7th Cir. 2016). SA asserts that it neither owed a duty to TGC nor proximately caused the alleged injury, so the receiver's claim must fail. (Dkt. 40 at 11-22). Because the first argument proves dispositive, the Court takes no position on the second point.

An attorney entering into a contract with a client owes a duty to render competent legal advice. *In re Estate of Powell*, 12 N.E.3d 14, 20 (Ill. 2014). The question of whether a legal duty exists is a question of law.[1] *Id.* "While the plaintiffs are entitled to plead a legal malpractice action in either tort or contract, recovery under both theories in the same complaint is sought in the alternative." *Majumdar v. Lurie*, 653 N.E.2d 915, 920 (Ill. App. Ct. 1995). Even when duty is "grounded in tort," courts look to the contract to define legal services because, at bottom, the legal action "arises out of either an express or implied contract." *Id.* at 918. "Consequently, because the duty owed by the attorney arises out of a contractual relationship, it is necessarily limited by the scope of the contract of engagement." *Id.*

The contract between SA and TGC explicitly states the SA's representation was limited to two analyzing two legal questions. The Engagement Letter's plain language says as much. SA

---

[1] Damian correctly notes that "what information the Firm obtained from TGC and what the Firm did with that information is a question of fact." (Dkt. 43 at 5). The Court, of course, assumes all factual allegations are true at the motion-to-dismiss stage. *Crescent Plaza Hotel Owner, L.P.*, 20 F.4th at 307. There should be no mistake though that the overarching question of whether SA had a duty beyond the Engagement Letter is legal.

agreed to "analyze whether a certain instrument [i.e. the Agreement] … constitutes a "security" for state or federal regulatory purposes" and advise on responding to the Smart Money subpoena. (Dkt. 27 ¶ 25). SA did exactly that—they provided a legal opinion about whether the contracts were securities (they are) and how to respond to the subpoena. Yet, Damian wishes to impose a general duty to investigate TGC, uncover a complex Ponzi scheme, assist them in complying with the law, and undertake any other measures necessary to avoid the (inevitable) SEC action. (*Id.* ¶ 51). The words of the contract, however, simply cannot bear the obligations Damian seeks to impose, and she concedes as much.

Undeterred, Damian raises two unconvincing reasons why SA's duties extended beyond the Engagement Letter's limits: (1) SA breached certain implied duties, including "the duty of every attorney to inform a client of the available options for alternative legal solutions," (Dkt. 43 at 4); and (2) SA impliedly expanded its duty beyond the letter by rendering legal advice not related to the specific issues the firm addressed, (*id.* at 6). First, Damian makes an understandable legal error. Under Illinois law, attorneys do owe clients a duty of fidelity, honesty, loyalty, good faith— and informing clients of "available options for alternative legal solutions." *Keef v. Widuch*, 747 N.E.2d 992, 997 (Ill. App. Ct. 2001); ILCS S. Ct. Rule of Prof. Conduct 1.7. But these duties are professional, implicit in any contract for legal services and more closely related to the standard of care. These free-floating responsibilities do not, however, obligate attorneys to engage in any substantive area that may arise in a case. *See Majumdar*, 653 N.E.2d at 918. The legal contract between the attorney and client sets out the limits of representation, and so long as an attorney executes these duties with competence, loyalty, and fidelity, nothing more is required.

This Court's opinion in *F.D.I.C. v. Mahajan*, No. 11 C 7590, 2012 WL 3061852 (N.D. Ill. July 26, 2012), is factually distinguishable. The relevant attorney in *Mahajan* was a Board member

5

of the company and the Bank's principal legal counsel. *Id.* at *3. He and his law firm were involved in a series of risky loans between the Bank and hotel developers, the losses of which totaled more than $44 million. *Id.* Most importantly though, there was no contract limiting representation. *Id.* This Court did, indeed, reason that a "failure to warn directors and officers that their practices subjected the bank to a high risk of loss could constitute malpractice"—but that conclusion was limited to the factual circumstances. *Id.* at *9. A company's primary legal counsel may have a duty to warn directors and officers; that duty, however, simply does not extend to counsel retained for limited representation. *See Majumdar*, 653 N.E.2d at 920.

Furthermore, although the attorney-client relationship can expand if an attorney begins offering legal advice on subjects beyond the original representation, Damian failed to provide enough facts to suggest SA offered meaningful advice on topics beyond those outlined in the Engagement Letter. An attorney from SA, John Collen, told Courtright that "the SEC investigation could easily expand to include/target Today's Growth," and TGC operated "the same basic business" as Smart Money's Ponzi scheme. (Dkt. 27 ¶ 28). But these two isolated statements only raised the possibility that TGC might face further litigation. The complaint does not provide any factual support for the proposition that SA provided legal services to TGC on a pending investigation, securities law, or the company's corporate structure; nor were they asked to do so. There are no communications, documents, emails, or any other evidence expanding the scope of their agreement. If SA had begun representing TGC on these matters, there would surely be some indication beyond two sentences in a several years-long attorney-client relationship.

Damian will have an opportunity to buttress her claim with additional factual support if she is able. But courts have good reason to honor legal contracts. A law firm that strays from its

6

contractual limits risks overcharging clients, engaging in invasive and nonconsensual behavior, and representing a person or entity when the law firm might not be the preferred choice.

## II. Aiding and Abetting Breach of Fiduciary Duty

A claim for aiding and abetting a breach of fiduciary duty requires the plaintiff establish the following elements: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003). TGC undoubtedly committed a wrongful act that caused injuries by operating a Ponzi scheme. SA believes the claim falters on the latter two elements. The Court again limits its focus to one element, the third, because the analysis is decisive.

Damian has not sufficiently alleged that SA substantially assisted TGC in the Ponzi scheme. The complaint notes the long timeline: Courtright founded TGC in 2009, well before the company contracted with SA. (Dkt. 27 ¶ 27). In fact, TGC's general counsel only reached out to SA seven years later—after the SEC began investigating a partner company. (*Id.* ¶ 19). SA agreed to provide limited representation by answering only two legal questions: whether the disputed agreements were securities under federal and state law, as well as how TGC should comply with an SEC subpoena. (*Id.* ¶ 25). At best, SA became aware that TGC might be operating under a problematic business structure, as one lawyer said to Courtright. (*Id.* ¶ 28). But a passing remark falls short of "substantial assistance." *Thornwood, Inc.*, 799 N.E.2d at 767. Moreover, SA answered the question by largely finding the company failed to comply with the law. (*Id.* ¶ 31). It is hard to surmise how a legally defensible (if not correct) and adverse conclusion could assist the company commit large-scale fraud.

Damian returns to the familiar argument that SA failed to "investigate TGC's representations," failed to "register the Agreements with the SEC," and failed to "advise TGC" on compliance with the law. (*Id.* ¶ 59). Illinois caselaw though flatly holds that failures to act do not constitute "substantial assistance": "While allegations of having knowledge and failing to take certain actions may be part of a cause of action for negligence in certain instances, those allegations do not allege that defendants … substantially assisted in the principal violation." *Grimes v. Saikley*, 904 N.E.2d 183, 197 (Ill. App. Ct. 2009). The complaint does allege that SA assisted TGC in purchasing websites to continue its operations, but at this stage, this allegation is too skeletal to support the broad claim put forth. It neither establishes how SA assisted TGC nor how this action furthered the Ponzi scheme. *See Def. Sec. Co.*, 803 F.3d at 334 (emphasizing "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" cannot survive past the motion to dismiss).

## CONCLUSION

For these reasons, SA's motion to dismiss for failure to state a claim is granted. (Dkt. 39). The dismissal shall be without prejudice to the filing of an amended complaint no later than February 10, 2023, if it is able to do so. *See Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) ("The law is clear that a court should deny leave to amend only if it is certain that amendment would be futile or otherwise unwarranted."). If no complaint is filed by that date, the dismissal shall convert to one with prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: January 19, 2023