IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE E. DAMIAN, AS RECEIVER OF TODAY'S GROWTH CONSULTANT, INC. (dba THE INCOME STORE), | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 22 C 2830 |
| v. | ) ) | Judge Virginia M. Kendall |
| SMITHAMUNDSEN, LLC, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Today's Growth Consultant, Inc. ("TGC") was allegedly involved in a "Ponzi scheme perpetrated by TGC and its founder, Kenneth D. Courtright." (Dkt. 57 ¶¶ 4, 15). As part of the scheme, TGC entered into "Consulting Performance Agreements" ("CPAs") with investors, whereby investors agreed to provide upfront and ongoing payments in exchange for "revenue generating websites" that TGC developed, maintained, and hosted. (*Id.* ¶¶ 5, 15). TGC, however, was unable to keep up with the necessary investor payments, so the company resorted to paying existing investors with new investor funds, not from website revenue. (*Id.* ¶ 5).

On May 31, 2015, the Securities and Exchange Commission ("SEC") issued a subpoena to TGC as part of an investigation into Smart Money Financial Group, Inc. ("Smart Money"). (*Id.* ¶¶ 17, 19). The agency requested that TGC produce documents and information related to the CPAs. (*Id.* ¶ 19). This production posed a problem for TGC because if a CPA was a "security," then TGC was required by law to file a registration statement with the SEC. (*Id.* ¶ 18) TGC's general counsel, Michael J. Polachek, decided to retain SmithAmundsen ("SA") as TGC's primary

1

securities counsel. (*Id.* ¶ 19). On June 15, 2016, the two parties agreed to the Engagement Letter, which set out the scope of SA's representation:

> 1) To analyze whether a certain instrument [*i.e.* the Agreement], which [Ken Courtright] will send to us, constitutes a "security" for state or federal regulatory purposes, or otherwise requires Today's Growth or its employees to be licensed, and 2) counsel Today's Growth in connection with complying with an SEC subpoena to it in In the Matter of SMFG, Inc., (D-3617).

(*Id.* ¶ 20).

SA collected information to answer the two questions outlined. (Dkt. 55 at 2). Early on, one SA attorney noted that the SEC investigation might broaden to include TGC. (Dkt. 57 ¶ 22). John Collen wrote in an email, "I have advised Ken [Courtright] that the SEC investigation could easily expand to include/target Today's Growth" because Smart Money "is a Ponzi Scheme," and Smart Money was "in the same basic business as TGC." (*Id.*) In the end, SA produced a memo concluding that "the key issue of whether the interest conveyed under a [CPA] constitutes a security is inconclusive." (*Id.* ¶ 25). "[I]t is possible to provisionally conclude that the S.E.C. and probably even the Seventh Circuit would take the position that the [CPAs]—at least the one with SMSIF—are investment contracts," and thus securities. (*Id.*)

TGC gave SA more agreements to analyze, but SA "did not issue an update" and "stalled in response to repeated inquiries from Polachek seeking a more conclusive answer." (*Id.* ¶ 30). Over the next several months and well into 2017, SA and Courtright exchanged emails about how to ensure compliance with securities law. (*Id.* ¶ 31). SA even assisted TGC's purchase of 151 websites owned by Smart Money the next year. (*Id.* ¶ 32). Polachek was still concerned, though, that the CPAs were securities and recommended SA re-review the agreements. (*Id.* ¶ 33; *see also id.* ("For several years now I have been concerned that the Consulting Agreement could be interpreted to be the sale of a security.")). TGC then asked SA to analyze the agreements again.

(*Id.* ¶ 34). This time, SA definitively concluded that the agreements were investment contracts (that is, securities), charging "TGC over $6,000 to research the same case law and perform the very same analysis that it had three years prior." (*Id.* ¶ 34).

The warning came too late for TGC. The SEC brought an action against the company. (*Id.* ¶ 6). A court in this district entered a Temporary Restraining Order Freezing Assets and an Order Appointing Receiver. (*Id.*) Melanie E. Damian was appointed as receiver. (*Id.*) She sued SA for legal malpractice and aiding and abetting breach of fiduciary duty. (Dkt. 27 ¶¶ 48-60). SA moved to dismiss the complaint for failure to state a claim, (Dkt. 39), which this Court granted with leave to amend, (Dkt. 55). Damian filed her Second Amended Complaint ("SAC") for one count of legal malpractice, abandoning her claim for aiding and abetting breach of fiduciary duty. (Dkt. 57). SA moves to dismiss to again for failure to state a claim. (Dkt. 63).

Under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678).

3

"To succeed in an action for legal malpractice, a plaintiff must plead and prove '(1) the existence of an attorney/client relationship; (2) a duty arising from that relationship; (3) a breach of that duty on the part of defendant/counsel; (4) proximate cause; and (5) damages.'" *Rojo v. Tunick*, 193 N.E.3d 149, 156 (Ill. App. Ct. 2021) (quoting *Paulsen v. Cochran*, 826 N.E.2d 526, 529 (Ill. App. Ct. 2005)); *see also Rocha v. Rudd*, 826 F.3d 905, 909 (7th Cir. 2016). As before, the parties dispute SA's legal duty, the only issue this Court addressed in SA's previous motion to dismiss.

An attorney entering into a contract with a client owes a duty to render competent legal advice. *In re Estate of Powell*, 12 N.E.3d 14, 20 (Ill. 2014). The question of whether a legal duty exists—and the extent of such duty—is a question of law. *Id.* "While the plaintiffs are entitled to plead a legal malpractice action in either tort or contract, recovery under both theories in the same complaint is sought in the alternative." *Majumdar v. Lurie*, 653 N.E.2d 915, 920 (Ill. App. Ct. 1995). Even when duty is "grounded in tort," courts look to the contract to define legal services because, at bottom, the legal action "arises out of either an express or implied contract." *Id.* at 918. "Consequently, because the duty owed by the attorney arises out of a contractual relationship, it is necessarily limited by the scope of the contract of engagement." *Id.*

Previously, Damian argued that the attorney-client relationship between TGC and SA encompassed a "general duty to investigate TGC, uncover a complex Ponzi scheme, assist them in complying with the law, and undertake any other measures necessary to avoid the [] SEC action." (Dkt. 55 at 5). She arrived at this conclusion by relying on implied duties that, in her view, were imposed by Illinois law. (*Id.* at 5–6). This Court rejected that argument. (*See generally id.* at 5–7). Now though, Damian presents a new theory that adheres closely to the agreement between

4

the parties by asserting that the SAC states a plausible claim for relief *based on* the two issues SA agreed to answer.[1] This pivot makes all the difference.

The attorney-client relationship between TGC and SA—like any attorney-client relationship—is defined by their contract—in this case, the Engagement Letter. (*See* Dkt. 57 ¶ 19 ("The Engagement Letter [] provided the initial scope of SmithAmundsen's representation of TGC")). There, SA agreed to answer two questions: "whether a certain instrument [i.e. the Agreement] … constitutes a 'security' for state or federal regulatory purposes" and how to respond to the SEC subpoena in *In the Matter of SMFG, Inc*. (Dkt. 57 ¶ 20). SA, thus, had a legal duty to undertake this agreed-upon representation. The firm asserts that the SAC should be dismissed because it "had no duty to advise TGC regarding matters entirely *outside* the scope of its retention and representation." (Dkt. 64 at 9). That is true—but Damian can still recover for negligence *within* the scope of SA's retention and representation, which is the theory she advances. The upshot of narrowing her complaint may have downstream consequences; that possibility, though, is for another day. With the scope of the duty established, the focus turns to whether the SAC's facts plausibly suggest that SAC breached its duty of care to provide legal advice.

"Attorneys are liable to their clients for damages in malpractice actions [] when they fail to exercise a reasonable degree of care and skill." *Barth v. Reagan*, 564 N.E.2d 1196, 1199 (Ill. 1990). Here, SA plausibly failed to exercise "a reasonable degree of care and skill" by providing provisional answers to obvious outcomes and delaying answers on company-critical legal questions. *Id.* SA signed the Engagement Letter on June 15, 2016. (Dkt. 57 ¶ 20). A month later

---

[1] Damian does argue again that SA owed TGC the duty of competence. (Dkt. 69 at 10). This Court acknowledged previously that attorneys are bound by the duties of competence, fidelity, honesty, loyalty, and good faith—just within the confines of the legal representation, which Damian recognizes with her reframed submission. (Dkt. 55 at 5). Analytically though, the question of whether an attorney performed competently relates more to the standard of care than the scope of duty.

SA produced a memo analyzing TGC's company model, stating that the "key issue of whether the interest conveyed under a Consulting Performance Contract constitutes a security is inconclusive." (*Id.* ¶ 25). But it was only possible to make a "provisional[]" conclusion. (*Id.*) By equivocating, SA may have "provided [a] grossly faulty [] opinion and did not act with urgency." (*Id.* ¶ 29). Damian supplies several facts as to why the answer should be "obvious": TGC had been operating for years without securities counsel; the agreements had never been registered as securities, yet the SEC had them in its possession; the memo acknowledged the SEC and the Seventh Circuit would likely arrive at the position; and—perhaps most damningly—the SEC was investigating a principal investor for operating a nearly identical scheme. (*Id.* ¶ 28). To make matters worse, SA dragged its feet for the next three years, making a concrete conclusion only after TGC asked again and a long period of time passed. (*Id.* ¶ 33). Taken together, these actions could constitute negligence, and deciding the issue at the motion-to-dismiss stage with little briefing would be premature.

As for causation, a plaintiff must "plead facts which, if true, establish a proximate causal relationship between the negligence of the attorney and the damages alleged to have been suffered as a consequence thereof." *Estate of Powell ex rel. Harris v. John C. Wunsch, P.C.*, 989 N.E.2d 627, 632 (Ill. App. Ct. 2013). Unlike duty though, "[t]he issue of proximate causation in a legal malpractice setting is generally considered a factual issue to be decided by the trier of fact." *Governmental Interinsurance Exchange v. Judge*, 850 N.E.2d 183, 192 (Ill. 2006) (quoting *Renshaw v. Black*, 701 N.E.2d 553, 557 (Ill. 1998)). More specifically, "issues that could cause a reasonable person to reach different results" on whether an act caused an injury "should never be determined as questions of law." *Id.* "The debatable qualities"—that is, the facts "that fair-minded persons might reach different conclusions" on—emphasize the "appropriateness of leaving such issues to a fact-finding body, *i.e.*, the jury." *Id.*

Damian adequately alleges that SA's negligence caused "a deepening of TGC's insolvency" and "irreparable damage to TGC and TGC's creditors." (Dkt. 57 ¶ 51). If TGC had been properly advised, the company may have registered the agreements as securities, conducted more thorough reviews of its business portfolio, and corrected some of its unlawful business practices. Moreover, TGC's investors and creditors may have been better informed and either not invested or helped TGC avert collapse.

SA contends that TGC would never have followed SA's advice because it did not change company practices after the July 2016 memorandum. (Dkt. 64 at 12). But this argument omits two critical facts. *First*, it was TGC that reached out for a legal determination. (Dkt. 57 ¶ 19). Typically, clients that hire a lawyer and spend money on representation will follow the advice provided. Admittedly, many clients ignore sound legal advice—to lawyers' great dismay—but at this early stage, it suffices to allege that TGC may have followed SA's recommendation. *Second*, SA only made a provisional recommendation. The fact that TGC failed to register the agreements can be attributed to the wavering advice.

As a fallback position, the firm maintains that "the SAC still fails to allege any proximate causal connection between TGC's selling of unregistered securities *and its operation of a Ponzi scheme*." (Dkt. 64 at 13). Perhaps the link between the negligence and the Ponzi scheme could be expounded upon. This Court does not, however, take a position on that argument because the SAC never tied the legal advice solely to the operation of a Ponzi scheme. Paragraph 51 proffers a more grounded theory: "As a result of the Defendant's breaches of duty to TGC, TGC sustained significant injury and loss, including *inter alia*, a deepening of TGC's insolvency, causing irreparable damage to TGC and TGC's creditors." (Dkt. 57 ¶ 51). Thus, the allegation links the negligence to the deepening insolvency and creditor harm, not every injury resulting from the

Ponzi scheme. Again, the causal chain works like this: if SA had offered prompt and clear legal advice, TGC would have registered its agreements as securities; doing so would have corrected TGC's business (at least partially) and alerted creditors; and by neglecting that step, TGC and its creditors suffered. To the extent that Damian's theory has weak points, such inadequacies should be left to a jury or addressed at summary judgment. *See Governmental Interinsurance Exchange*, 850 N.E.2d at 192.

The damages for this alleged negligence are the loss of money to TGC and its creditors, a contention SA does not challenge. Thus, Damian sufficiently pleaded every element of a legal-malpractice claim.

For these reasons, SA's motion to dismiss for failure to state a claim is denied. (Dkt. 63).

_____
Virginia M. Kendall
United States District Judge

Date: June 8, 2023